Benning *vs.* Benning's Ex'or.

ERROR TO FRANKLIN CIRCUIT.

1. B. conveyed certain slaves and other property to a trustee, abso-
lutely, declraing a particular use, and then expressly gave up all
his *right, title, and interest,* and bound himself and his heirs *nev-
er* to claim the property, or any of it, or the profits, at any time
*whatever.* Held, that no implication can arise of any intention
on the part of the grantor, that any use should result to himself
after the particular use had been accomplished, and none did re-
sult.

2. The fact that a grantor of property in trust for the use of his wife,
for life, believed that he had only an estate therein for the life of
the wife in the property, when he had an estate in fee, did not
conduce to show that he intended that a trust should result to
him or his heirs after the death of the wife.

3. A deed of trust by the granting clause, conveyed all the *right, title,*
and *interest* of the grantor in certain slaves, to a trustee for the
use and benefit of the *cestui que use;* by the *habendum* it is said
to be held in trust for the use and benefit of the *cestui que use,*
so long as she lives, and to appropriate the proceeds to her sup-
port during that period. Held, that the terms of the *habendum*
did not have the effect to limit the use to the life of the *cestui
que use,* which, by the granting clause, was unlimited, but was
only a distinct appropriation of the proceeds during the life of
the *cestui que use* to a particular purpose, and for a particular
period. (2 *Black,* 298.)

4. The term *heirs* which at common law was necessary to pass an
estate in fee in lands, has never been held necessary in a deed to
pass the absolute title to slaves or any personal estate, nor is the
term necessary in a conveyance of slaves in trust, to pass the en-
tire right of the grantor to the *cestui que use.*

In 1825 Sarah Benning instituted a suit in chancery
against her husband, Anthony Benning. She alleged
in her bill that the defendant had treated her with
great cruelty and inhumanity, and that when she mar-
ried him she was in the possession of two negro slaves,
claiming them under a devise in the last will and tes-
tament of her father, Anthony Arnold, *to her and her
children, if she had any, but if she died childless, to her
surviving brothers and sisters.* These two slaves she
took with her, as she alleged, to the said Anthony
Benning on their marriage; and that one of them, be-
ing a female, had four children, all of whom were still
in his possession. She also alleged that she had not
herself had any children, and was then, from *age* and

*infirmity, rendered incapable* of having any. She prayed for a divorce, and a return to her *individual possession* of the said negroes and their increase, or in the event of the rejection of that prayer, that she might have a decree for alimony, and that the negroes aforesaid, which came through her, might be decreed back to her.

To this bill no answer was filed by the defendant, but in a few months after the suit had been commenced, it was compromised by the parties. To carry this compromise into effect the following writings were executed:

1. A deed of trust from Anthony Benning to Anthony Arnold, the complainant's brother, which is copied into this opinion, inasmuch as the questions involved in this controversy arises upon it, and reads as follows, viz:

"This indenture made this 1st day of April, in the year 1826, between Anthony Benning of the county of Clarke, and state of Kentucky, of the one part, and Anthony Arnold, as *trustee*, to the use and benefit of Sarah Benning, the wife of said Anthony Benning, of the county and state aforesaid, of the other part, witnesseth: That whereas said Anthony Benning and said Sarah Benning at this time live separate and apart from each other, and said Sarah Benning has a suit in chancery at this time depending in the Clarke circuit court against said Anthony Benning, for a divorce as well as for alimony; and said Sarah Benning, by said Anthony Arnold, hath compromised said suit by agreeing that said Anthony Benning shall convey to him, in trust for the use and benefit of said Sarah, a *certain portion of his, said Anthony's estate*, which the said Anthony Benning on his part agrees to do, and upon the doing of which said suit is to be dismissed: Therefore, and for the further consideration of the sum of one dollar to said Anthony Benning in hand paid, by the said Anthony Arnold, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, the said Benning

hath *bargained, sold,* and *delivered,* and by these presents doth *bargain, sell, convey* and *deliver,* unto said Anthony Arnold, in trust for the use and benefit of said Sarah Benning, *all* the *right,* title, interest, and estate of him, said Anthony Benning, of, in, and to the following property, viz: negro man slave Jim, about twenty-five years of age, and negro woman slave Sookey, about 22 years of age, and her four children, to-wit: Martha, about ten years of age; Ned, about seven years old; Kitty, about three years old; and Charlotte, about one year old; and also a sorrel filley between three and four years old, to have and to hold said property to said Anthony Arnold in trust, to the *use and benefit* of *said Sarah Benning,* so *long* as *she* (said Sarah) *lives.* And said trustee is to *appropriate* said slaves and mare, as thereby, to maintain and support said Sarah out of their annual profits so long as she (said Sarah) lives; and said Anthony Benning hereby gives up all his *right, title,* and *interest in them forever,* and binds himself, his heirs, &c., never to *claim them,* or *any of them,* or *their profits,* at any time whatever; and the hire of said negroes accruing since said suit was brought is also, in like manner, given up in trust, and it is the understanding of the parties hereto that said Anthony Benning and Sarah, his wife, are to continue to live separate and apart from each other, and that the estate hereby conveyed in trust is in full satisfaction of all claims to alimony or separate maintenance which said Sarah claims against said Anthony Benning, in said suit, and is, by said Benning, given up as alimony, and that, in consequence thereof, said *Sarah* is *not* to *claim* any *more* of *his estate,* or in any manner whatever to charge the same, either with her support, or for any other thing either heretofore contracted by her, or which may hereafter be contracted by or for her. In testimony, &c."

The foregoing deed was executed by both Anthony Benning and Anthony Arnold. The following agreement was, at the same time, executed by Anthony

BENNING
vs.
BENNING'S EX'R.

Benning, R. McCargo, Anthony Arnold, and Alfred Bowren, viz:

"Whereas, on this day Anthony Benning has conveyed to Anthony Arnold, as trustee to Benning's wife, (Sarah Benning,) six slaves, to-wit: Negro man Jim, negro woman Sookey, and her four children, viz: Martha Ann, Ned, Kitty, and Charlotte, and also a sorrel filley, as alimony, or for a separate maintenance to said Sarah Benning; and it was agreed that said Sarah Benning should give security never to claim any more of said Benning's estate, or to make it answerable for debts heretofore contracted by her, and which may be hereafter contracted by her, and that said Anthony *Benning should also give* security *never* to *claim* the *property aforesaid conveyed in trust, or any of its profits;* and further it was agreed that said suit should be dismissed.

Now said Sarah Benning hereby gives Alfred Bowren her said security to said Anthony Benning, and said Bowren binds himself, his heirs, &c., that said Sarah Benning never shall claim any more of his (said Anthony Benning's) estate than is given up in said deed of trust, nor shall she or her heirs ever charge the said Anthony Benning's estate, not given up in trust as aforesaid, with any of the debts heretofore contracted by said Sarah Benning, or which may be hereafter contracted by her, or any one for her, either for necessaries or any other thing. And said Anthony Benning, hereby binds himself, his heirs, &c., and gives as his security Radford McCargo, who also binds himself, his heirs, &c., unto said Alfred Bowren, his heirs, &c., that the estate given up in trust, as aforesaid, *never shall be taken,* or *any part* or *parcel thereof, by him, said Anthony Benning, or his heirs,* or his *creditors,* or any one else, for any of the debts heretofore contracted by said Anthony Benning, or which may be hereafter contracted by him."

The agreement also contained a stipulation that the suit should be dismissed at the cost of the complainant. Anthony Arnold also entered into the contract

on the part of Sarah Benning, in conjunction with Alfred Bowren.

The possession of the slaves was delivered to Mrs. Benning immediately after these writings were executed, and she continued to hold them and their increase in her possession until her death, which occurred in February, 1853.

In 1848 some of the grandchildren of Anthony Arnold, deceased, the father of Mrs. Benning, exhibited their bill in chancery against her, alleging that under the will of their grandfather they had an interest in said slaves after the termination of her life estate, and charging her with an intention to remove them to some state where they would be free, and on this ground, they prayed for a restraining order, and other equitable relief.

Mrs. Benning, in her answer, denied the intention imputed to her, or that she had ever had it in contemplation to remove the slaves. She insisted, "now that she was sued and harrassed, that said will of her father gave her an absolute title to the slaves; and for the purpose of trying the question, she denied the right of any of her brothers and sisters, or their descendants, to any of the slaves. She also filed a demurrer to the complainant's bill. The circuit court decided that she acquired under the will of her father an absolute title to the slaves." That decision was affirmed by this court, and the opinion is reported in 9 B. Monroe, page 623.

It is perfectly evident from the statements contained in the bill exhibited by Mrs. Benning, for alimony, and also from her answer in the suit against her, by her own relations, to prevent a removal of the slaves to a free state, that she had always supposed she was only entitled to a life estate in the slaves under her father's will, and that, as she would die childless, the slaves would, after her death, go to her brothers and sisters and their descendants. It does not appear that she had ever claimed to be the absolute owner of the slaves, nor supposed that she had any other or greater

interest in them than a life estate, until it was so determined in the suit already referred to. Before her death she made a will, in which she emancipated all these slaves, and appointed an executor to carry the provisions of her will into effect.

This action was brought after her death against her executor, by the children and heirs at law of Anthony Benning, deceased, claiming said slaves as their property. They insist that their father, Anthony Benning, by his intermarriage with her, which took place in 1812, acquired an absolute title to the slave Sookey, then in her possession, and from whom all the other slaves in controversy have descended, and that the writings which were executed when the compromise of the suit for alimony was entered into, vested her with a life estate only in the slaves, which having terminated by her death, they are, by operation of law, entitled to them as the heirs of their father. They allege in their petition that their father, Anthony Benning, departed this life in the year 1827, intestate, and that he has no administrator now living. Anthony Arnold, the trustee named in the deed of trust, died many years since, and no other trustee was ever appointed in his stead.

The executor of Sarah Benning denies the right of the plaintiffs to the slaves, and contends. that by the deed of trust all the right and title of Anthony Benning to them was conveyed by him, and vested in his wife absolutely, as the benificiary in the deed.

The circuit court, to whom the law and facts of the case were submitted by the parties, gave judgment for the defendant, and to reverse that judgment the plaintiffs have prosecuted a writ of error.

ALLAN, and MOREHEAD & BROWN, for plaintiffs—

1. The ambiguity in the deed of trust is found in the form and not in the substance. The law presumes the parties to understand the substance, and to be ignorant of the form. This deed should be construed according to the order of ideas and not of

words.  Two distinct things are to be regarded—1.
The clause that relates to the conveyance of the
things granted to the trustee, which are called the
premises.  2. The words that relate to the interest
which the *cestui qae use* is to have, called in law a
declaration of the use ; these two things being in their
nature distinct, are always expressed in appropriate
words applicable to each.

The ambiguity in this deed is owing to an inartifi-
cial composition, in which ideas belonging to one sub-
ject are blended with those appertaining to another.
The rules of just criticism require the court to analyze
these ideas, and classify them according to their na-
ture.  Ideas cannot be changed by and mixed with a
discordant mass.  All the ideas in the deed of trust,
appertaining to the premises when classified and
properly arranged, will make a deed in its substance
and sense as follows : "The slaves, mare, and hire
were sold and granted to the trustee forever, for the
use of Sarah Benning, to have and to hold for the life
of S. Benning."   And suppose the legal estate passed
to the trustee ; this is giving the words their full force.
We next come to the interest of the *cestui que trust*,
"and the trustee is to appropriate said slaves and mare
as thereby to support said Sarah out of the annual
profits, so long as she lives."   We have now the two
things before us—1. The premises of this deed opera-
ting between the grantor and grantee, by which was
defined the things that passed by the grant.  2. The
declaration of the use.  In the premises the interest
of the trustee is defined, and in the declaration of trust
the interest of the *cestui que trust* is defined, and then
two distinct things are expressed in distinct clauses,
having distinct meanings.  This state of the case
presents to the court a common deed of trust, in strict
conformity with universal usage, where the legal title
is conveyed in fee simple, charged with the payment
of debts.

In this case, the estate was charged with the sup-
port of Sarah Benning out of the annual profits, so

long as she lived, which has been done, and she is now dead. In this state of case the law is clear that the estate results to the grantor and his heirs—2 *Black.* 234; *Story's Equity,* 2 *vol.,* 607, *sections* 1199 *and* 1200; *Sugden on Powers,* 4, 103. If an estate be conveyed for a particular object, and that object be accomplished, a resulting trust will arise for the benefit of the grantor and his heirs—*Fonblanque's Equity ; Powell on Devises; Kent's Commentaries.* If there be two declarations of trust in the same deed, variant from each other, the first shall prevail—*Petersdorff, vol.* 15, *page* 243. A grant by the king to A and his heirs, of land for the use of A for life, A has an estate for life, and the king has the inheritance without office found—15 *Petersdorff,* 422. He who has the equity of redemption is considered the owner of the estate—1 *Atkinson,* 63.

2. Although it is usual to convey the legal title in fee to the trustee, as above shown, to support a use for a limited time, and therefore in this case can make no difference if the trustee had the legal title in fee ; but if in this case the legal title for life only was vested in him, it is very important to show it, on a question of intention, and also on a question of law ; for who ever heard where the legal title was vested in a trustee for life, to support a fee in the use. If the trustee had but a life estate, it is conclusive proof that the use was but for life.

3. In respect to the doctrine of repugnance in the different clauses of deeds, as applicable to this case. If the clause in this deed, which creates all the ambiguity, be construed either as conveying the legal title in fee to the trustee, or as declaring a use to the *cestui que trust* in fee, then this clause is void for its repugnance. There stands in the deed before it a grant of the legal estate for life to the trustee ; these two clauses are totally repugnant, and there is no recital in the deed to show that the last shall prevail ; on the contrary, all the recitals are the other way, so that if this clause "to give up forever" imports a conveyance of

the legal title to the trustee in fee, it is void for its repugnance. But this clause "to give up forever" must either apply to the legal title and the trustees, or it must be a declaration of the use to the *cestui que trust*. If it be taken in the latter sense then it is void, because there stands before it in the deed a declaration of the use to be out of the annual profits, while the *cestui que use* lived, which is totally repugnant to the use in fee; and there is no recital in this deed to show that it was the intention of the parties that she should have the fee in the use, but on the contrary all the recitals show that the use for life only was intended. The doctrine is as well settled that where there is two declarations of use in a deed of trust, that the first shall prevail over the second, as it is settled that in all other deeds that the first shall prevail over the second.

4. In respect to that clause of the deed which binds the grantor to "give up forever," and never to claim the property—it is a mere repetition of the terms of the grant; it adds nothing to the legal obligation of the grant; this is the only claim that gives rise to the controversy in regard to ambiguity. If the word *forever* was changed to *for life*, the whole controversy would be put to rest. It is contended that this term *forever* applies to the life estate, and should be applied to the life estate to the *cestui que trust*. Take an example for illustration from the Bible: "And his master shall bore a hole in his ear with an awl, and he shall serve him forever," that is, during their joint lives. Blackstone says a grant to a man forever shall be for his life. From Shakspeare: Portia says your wife shall not be mad forever. I grant my horse, my slave, my house, my time for years, forever, that is, during the existence of these things. I grant my fee simple forever, that is, so long as the title endures. I grant my term for twenty years, forever, and agree that me nor my heirs shall claim it at any time whatever. Forever here means the whole term of twenty years; and at any time whatever means at no time

during its continuance. I grant my life estate forever, that is, during its whole continuance. This meaning of the term forever is not denied, but it is by them applied to the life of the slaves, and it is by plaintiff applied to the life of Sarah Benning.

The evident intention of the parties was to give Sarah Benning a support for life, and such is a fair interpretation of the conveyance; it is characterized as alimony; only one word is set up to convert this estate into a fee, and that one of the most ambiguous in the language. This word may be disposed of in five ways—1. It is connected with a clause of conveyance, and appertains to the premises, and spends its force on the legal title, and has no reference to the interest of the *cestui que trust*. 2. It has been shown that only a life estate passed to the trustee, and the life estate is the duration of the use. 3. If this one word creates an ambiguity the rule is, that in the construction of a deed that which is certain shall control that which is doubtful, and this whole deed is clear and certain, save that one word. 4. On manifest intention this court has the right to supply the word *"life"* before estate. 5. If the clause imports a fee, either in the legal title or the use, it must be rejected for repugnance to preceding clauses. 6. Because it has been shown that the parties intended by the words to give up the life estate, which was the subject of the contract, and not a fee; that they all agreed was the property of others.

5. Alimony was what was intended to be secured, which is a maintenance secured by judicial authority during coverture, or until reconciliation. It is only whilst the wife lives apart from her husband during coverture that she can claim alimony. A demand of alimony being personal dies with the husband—*Fonblanque, 3d American Ed.* When it is decreed, it should only be during the joint lives of husband and wife. It is not proper to decree a division of the husband's estate—a reasonable allowance out of the annual profits of the estate is all that is proper. The usual

allowance is a third of the profits of the estate, sometimes a fourth—See 3 *Dana*, 28, *Lockridge's case*. And in a suit for alimony no decree can be rendered for an absolute title to property—3 *Dana*, 189—it cannot be longer than for life. The principle upon which alimony is allowed is, that the husband has possessed himself of the wife's fortune, and that she has not sufficient means independent of him to support her in her rank of life. It has been refused where she had a separate income. Alimony may sometimes be decreed for life. Where the bulk of the fortune came by the wife, in an offensive case of adultery by the husband, the court gave the wife a moiety of the income—See 8 *Petersdorff*, 461. In this case the greatest amount which should have been allowed by the chancellor was a third or a half of the income whilst the wife lived, and considering the circumstances of Benning, the use of the slaves for life was a generous provision; and so far as the subject can admit of an estimate of consideration, it is a strong argument to show that a life estate was what was intended to be passed.

On the rules to be observed in the construction of contracts the court are referred to the following authorities—where the language used is susceptible of more than one interpretation. The court will look at the surrounding circumstances existing when the contract was made—the construction of the parties and the subject matter of the contract—*Wilson v. Troup*, 2 *Cowper*, 195, 228; *Parkman v. Smith, Willis' Reports*, 332; 13 *Peters* 89. Where there is ambiguity the court will call in the conduct of the parties under the deed—16 *Johnson* 22; 3 *Atk.*, 576; 10 *Vez.*, 338; 7 *East.*, 199; 4 *East.*, 327; 8 *Bing.*, 181. The law will give effect to the presumed as well as the expressed intention of the parties—1 *Comstock*, 96. A grant of a house passes the title to land—6 *Iredell*, 96. When words or clauses are contradictory, the specific will control the general—15 *Vermont Rep.*, 519; *Maine Rep., Ship*, 169. If the intention is clear the mode or

BENNING
vs.
BENNING'S EX'R.

form of expression is not regarded—1 *Sandf. C. R.*, 238. The intention is collected from the deed, and not from a clause or word—15 *Vermont Rep.*, 522. Particular words will control general expressions. The general terms were that lands were to pass, but by the particular word the court held that it passed shares in a corporation—15 *Vermont Rep., supra.*

The extent of the title given to the trustee may be collected from the trusts declared—*Desausure's North Carolina Rep.*, 455—so the extent of the trust may be collected from the title vested in the trustee by a parity of reason. When a question arises as to the thing granted, recitals may aid in the constsuction—2 *Vern.*, 7; *Wight.*, 98. The law will construe that part of a deed shall precede, in construction, which ought to take precedence in whatever part of the deed it may be found—2 *Pick.*, 18. The language of a deed may be modified, or effect given to particular passages, by the state of things at the time at which it is to operate —*Salsbury v. Andrews*, 19 *Pick.*, 250. General words may be limited by a recital—9 *Ship.*, 350. In the construction of a grant the court will consider the circumstances attending the transaction, and the particular situation of the parties to find the intention— 3 *Mass. Rep.*, 352. The construction is to be according to the intention of the parties—5 *B. Monroe*, 501, 2; 6 *Ib.*, 619; 2 *Ib.*, 166; 9 *Ib.*; 3 *Ib.*, 145; 2 *Saund.* 96; *citing Coke Litt.* 301. A grant to a man and his heirs has been held to pass the fee, or limit an estate for life when the intention of the parties would thereby be carried into effect.

J. HARLAN, for defendant—

The only question for decision in this case is, whether the plaintiff below and plaintiff here are entitled to a judgment for the slaves in the pleadings described, and the decision of this question depends upon the legal construction that may be given to the deed of trust of the first of April, 1826, between Anthony

Benning of the one part, and Anthony Arnold of the other part.

Waiving any objections, for the present, to the form in which this record is made up, we come to the questions presented by the counsel for the plaintiff, and on which they rely to reverse the judgment of the court below. The grounds assumed by plaintiff's counsel may be stated thus :

1. That the marriage between Anthony Benning and Sarah Benning, in 1812, vested in said Anthony an absolute title to the slaves then owned and possessed by his wife.

2. That by the deed of trust of April, 1826, to Anthony Arnold, as trustee for Sarah Benning, Anthony Benning conveyed an estate in the slaves in controversy, which was to continue during the life of the said Sarah, with remainder to the said Anthony Benning and his heirs.

The first proposition is not controverted by defendants. By the 34th section of the act of 1798—*Stat. Law*, 1477—the slaves of a woman vest in the husband on the marriage. But the second proposition is denied.

We set out with the maxim that "the words of an instrument shall be taken most strongly against the party employing them." Copied from *Broom's Legal Maxims, page* 254, 50*th vol. Law Library*, 169, *top*. The author proceeds, "it is a general rule that the words in a deed are to be construed most strongly, *contra proferentum*, regard being had however to the apparent intention of the parties as collected from the whole context of the instrument; for, as observed by Mr. Justice Blackstone, the principle of self-preservation will make men sufficiently careful not to prejudice their own interest by a too extensive meaning of their words, and hereby all manner of deceit in any grant will be avoided, for men would always insert ambiguous and intricate expressions, provided they were afterwards at liberty to put their own construction upon them." The same author proceeds (*page* 170,)

"so it is a general rule of construction, that where there is any reasonable degree of doubt as to the meaning of an exception in a lien, the words of the exception being the words of the lessor, are to be taken most favorably for the lessee, and against the lessor; and when a deed may enure to divers purposes, he to whom the deed is made shall have his election which way to take it, and he shall take it in that way which shall be most to his advantage."

These principles are laid down by the same author: "A liberal construction shall be put upon written instruments, so as to uphold, if possible, and carry into effect the intention of the parties—*page* 160. And for this purpose the whole instrument will be looked into to ascertain the intention of the parties—*page* 166. It is moreover, as a general proposition, immaterial in what part any particular covenant is inserted"— *page* 167.

Applying the foregoing principles and maxims to the case at bar, what is the law respecting limiting a remainder in slaves? By the 33d section of the act 1798, (2 *Stat. Law*, 1477,) a remainder in a slave may be limited by deed or will as a remainder in a chattel personal at common law, and not otherwise. This case stands then as if the deed of 1826 had conveyed a chattel personal. There is some discrepancy in the authorities on the question. By the ancient common law there could be no limitation over of a chattel, but a gift for life carried the absolute interest. 2 *Black.* 398; 2 *Kent*, 352. The rule was relaxed, and the remainder in a chattel was permitted by executory devise. *Ib.* Judge Bouvier in his Institutes, 2 *vol.* 294, says: "A remainder cannot be limited of a chattel interest or term of years, after an estate for life has been created out of the same—an executory devise can be so created." In *Moore's trustees v. Howe's heirs*, 4 *Monroe*, 219, this court decided that a remainder in slaves can be limited only where it could be created of a chattel personal at common law. In *Beaty v. Moore*, 2 *Dana*, 237, it is said there may be a

limitation of a remainder after a life estate in personalty, but it is confined to a devise by will or deed of trust. Regarding these two cases as settling the law in this court, the question arises does the deed of 1826 contain a provision limiting a remainder in the slaves therein conveyed.

The preamble to the deed recites, "that said Sarah Benning has a suit in chancery, at this time depending in the Clarke circuit court, against said Anthony Benning, for a divorce, as well as for alimony, and said S. Benning, by said A. Arnold, has compromised said suit by agreeing that said Anthony Benning shall convey to him, in trust for the use and benefit of said Sarah, a certain portion of his, said Anthony's estate. The said Anthony Benning, in consideration of the premises, and the sum of one dollar, bargained, sold, and delivered unto A. Arnold, in trust to the use and benefit of said Sarah Benning, *all the right, title, interest, and estate* of him, the said Anthony Benning, of, in, and to the following property, to-wit: (six negroes, and a sorrell filly,) for the support and maintenance of said Sarah Benning during her life; and said Anthony Benning hereby gives up all his *right, title,* and *interest* in them *forever*, and binds himself, his heirs, &c., never to claim them, or any of them, or their profits, *at any time whatever.*" The estate conveyed was to be in satisfaction of all claims to alimony, or a separate maintenance, which said Sarah claimed against her husband, and in consequence thereof said Sarah is not to claim any more of of his estate, or in any manner to charge the same. In the event either party violates the covenants contained in this deed, the other has a remedy on the written agreement, which was executed simultaneously with it.

Where are the words in the deed that creates a remainder in these slaves? None such can be found. The grantor gives up all his right, title, and interest in said slaves forever, and binds himself and heirs never to claim them. Do these words show a limita-

tion in remainder in the slaves? They expressly negative any such construction. There is not only an abandonment or giving up and surrender of all claim forever, but an express covenant never *to set up any claim at any time whatever.* It is a well settled principle of the common law, that a covenant that a party will never sue on a claim is a release of it. Bacon lays it down thus, "a covenant perpetual, as that the party will not sue without any limitation of time, is a defeasance or absolute release." (5 *Bacon, tit. Release, page* 683.) "This construction, (says the author,) has been given to avoid circuity of action, for if in such case a party should, contrary to his covenant, sue the other party, would recover precisely the same damages which he sustained by the others suing."

It is insisted that the language employed in the deed is susceptible of but one construction, and that the intention of the parties to it cannot be misunderstood.

The wife of A. Benning prayed for a divorce, and a surrender of the slaves which she had raised and brought to her husband on their marriage. The deed states that she had a suit pending for a divorce and alimony, and it seems to have been the object to dissolve the partnership, so to speak, so far as they could do it, and place each other as near as they could in *statu quo.* Can any one suppose that A. Benning believed that he or his heirs would ever be entitled to take possession of his wife's slaves? Did the draftsman of the deed intend to create a remainder in these slaves after the death of Mrs. Benning? If he did, he was eminently unsucccessful in the language employed. By the deed A. Benning parted with all his *estate.* What is the meaning of the word *estate?* Coke and Blackstone say that "when a man parts with his *estate* in Dale to A. and his heirs, every thing that he may possibly grant shall pass thereby." *Jacobs' Law Dic., vol.* 2, 435. A modern authority gives this definition: "The word estate, in its most extensive sense, signifies everything of which riches or fortune

may consist, and includes personal and real property. 2 *Bouvier's Inst*. 212. Is it impossible that when a man *gives up* and conveys all his interest and estate or property, that he shall retain some portion of it.

But it is argued here that the word *all* means part; that forever does not mean *always*, but only while an old woman lives; that when a man covenants that he will *never* do a certain act, it only means that he will not do it unless on a certain contingency; when a man covenants that neither he nor his heirs shall ever claim certain slaves, that it means his heirs may do it after he dies. This is an attempt to give new definitions to certain words, and in this deed, especially the word *forever*. Johnson's and Walker's definition is *eternally* to *perpetuity*. Webster, "*at all times*"—"*through endless ages*." It is argued that the meaning of those words should be changed, because the deed prescribes and stipulates the duties of the trustee to use the property in such a manner as to support the said Sarah during her life. This should be regarded as merely directory to the trustee, and as in no way affecting the character of the estate conveyed by the deed.

It is also said that, as this deed shows on its face that the consideration was the compromise of a suit for alimony and divorce, that it is evident that the parties only intended that a life interest was to be conveyed by the deed—these conclusions are too far-fetched. It is the settled law of this court, that a wife suing for a divorce may have a decree for a portion of her husband's estate in absolute right. *Fishli v. Fishli*, 2 *Litt*. 337. In this case Mrs. Benning was suing for divorce and alimony, and the parties compromised by her receiving her own negroes, and a sorrel filly, and giving security that she would never claim more of the husband's estate. They complied with the contract, but the heirs of the late husband are now violating his covenant. Will the court permit? If a life estate alone had been intended to be conveyed why were not appropriate words used showing that intention?

For ought that appears in the record Mrs. Benning would have succeeded in obtaining a divorce; and it would have been in the power of the circuit court to have decreed to her absolutely a portion of Benning's personal estate and slaves, and set apart to her a portion of his real estate, to be held during her life. The consideration for the compromise was ample; the inducement sufficiently strong for him to *give up* and surrender all the title he had to the slaves of his wife, and Benning so *understood when he signed the deed of trust.*

Can there be an implied remainder in a chattel according to the principles of the common law? By the common law a grant for life of a personal chattel was a grant of the entire title, but the court permitted a remainder where it was expressed on the face of the instrument; there cannot, therefore, be an implied remainder—it must be expressed.

A conveyance to A. for the benefit of B. gives the property to the latter, and it may be sold under execution against B.—such is our statute. *Eastland v. Jordan*, 3 *Bibb*, 186.

The deed in this case does not reserve anything for the grantor or his heirs, but if counsel shall be permitted to shuffle and change the position of the words of the deed, its legal meaning may be changed. The surrender of all title and claim to the slaves by Benning to Arnold, for the use of Sarah Benning, is in effect a conveyance of the whole title to her, and that is the meaning of the deed.

Our positions in this case, are—

1. That the deed shows on its face that Benning parted with all his right, title, and interest in the slaves forever, to A. Arnold for the use and benefit of Mrs. Benning, and bound himself and his heirs not to claim them, or any of them, at any time whatever, and consequently, the plaintiff showed no cause of action.

2. That if the legal construction of the deed be that a life estate was conveyed, it was the conveyance

of a chattel interest, and that he who conveys a life estate in a chattel, without reserving a future interest on the face of the instrument, the rule of the common law prevails and the whole title passes.

3. That the argument of plaintiff's counsel applies to the law of real estate, and is not applicable to a deed conveying a personal chattel.

J. B. HUSTON and S. HANSON, on the same side—

Argued—That the deed of trust of April, 1826, and the agreement, show that the absolute title to the negro passed to Sarah Benning, and was in her at her death. That it was the intention of the parties to the deed to pass the entire and absolute title, and not the mere use of the slaves.

In the premises of the deed all *right*, *title*, *interest*, and estate is specified. This is so far an absolute conveyance of title to the *property*—there is no implication. In the *habendum* of the deed it is said, to the use of Sarah Benning so long as she lives, and the trustee is to appropriate the slaves, &c., so as to maintain and support her out of the annual profits. These clauses are reconcilable.

The *habendum* is not inconsistent with the *premises*. This clause created an obligation upon the trustee to see that the annual proceeds of the property should be annually applied to the support of Sarah Benning during life; not otherwise appropriated, but applied to that particular purpose. Such was the purpose of the clause, and not as a limitation upon the absolute estate conveyed by the previous clause. This view is confirmed by reference to the clause, "and said Anthony Benning hereby *gives up* all his right, title, and interest in them, (negroes,) forever, and binds himself, his heirs, &c., never to claim them, or any of them, or their profits, at any time whatever;" it is further stipulated, "that said A. Benning is to give security never to claim the property aforesaid conveyed in trust, or any of its profits, &c." This shows a consistency in the whole arrangement, and that the inten-

tention was to invest Sarah Benning with the entire title and interest of A. Benning in the negroes; and this rule of construction should be adopted in the construction of instruments—*Coke's Rep.*, vol. 1, *page* 478, *Baldwin's case.*

It is argued that the circumstances in which the parties were placed may be considered in determining the construction of their contract, and that the circumstances of these parties at the date of this deed, and their former relation, &c., all concur to show the reasonableness of the construction now insisted upon.

If it was the understanding of the parties that Sarah Benning had only a life estate in the slaves named in the deed, it is not perceived why any effort should be made to grant a life estate only, and reserve the remainder when none existed.

According to well established rules, deeds are to be construed most strongly against the grantor, and in favor of the grantee; applying that rule in this case, if there be any repugnance in the deed, that repugnance must lead to that interpretation most favorable to grantee, and full effect be given to the grant in the premises in this deed, uncontrolled by anything in the *habendum*—1 *Inst.* 299, *a* 11, 534; 2 *Coke's Rep.*, *part* 2, *page* 478.

In this case the heirs of Benning are estopped by the covenant of their ancestor to claim this property— *Fitzhugh's heirs v. Tyler*, 9 *B. Monroe*, 560.

Sarah Benning claimed the absolute right in the negroes in contest more than five years before the commencement of this suit.

The object to be attained by Sarah Benning in her suit in chancery for divorce and alimony, was not confined to a mere claim for alimony or support, but for a divorce also, and by the compromise and adjustment all these claims were settled, so that alimony alone did not constitute the consideration of the agreement. All that Sarah Benning might have a right to ask on being divorced, formed equally with alimony

a part of the consideration of the conveyance. The argument therefore fails, that it was to satisfy the claim for alimony that the conveyance was made.

Judge SIMPSON delivered the opinion of the court.

The questions involved in this controversy depend upon the construction and legal effect of the writings which were executed when the suit for alimony was compromised. On the part of the plaintiffs it is contended, that although the deed of trust vested in the trustee all the title of the grantor in the property conveyed, he held it merely for the purposes mentioned in the deed, and as the only trust declared therein, was for the use and benefit of his wife during her life, it follows as a legal consequence, that when that trust was accomplished, and the life estate terminated, the use resulted to the grantor or his heirs.

The statement contained in the deed, that the grantor "gives up all his right, title, and interest in the slaves *forever*, and binds himself, his heirs, &c., *never* to *claim* them, or any of them, or their profits, at any *time whatever*," is, according to the argument for the plaintiff, accounted for by the fact that the parties entertained the belief, at the time the deed was executed, that the only title the grantor had in them was an estate during the life of his wife. Having conveyed that estate for the use of his wife, and not supposing that he had any other interest in the slaves, he gave up all his right to them forever, that is, he gave up forever the life estate which he held in them, and bound himself and his heirs never to claim them, at any *time whatever*, during the continuance of that estate. The same argument assumes that it must have been the intention of the parties to convey only an estate for the life of the wife, inasmuch as they believed that to be the full extent of the husband's title to the slaves, and that consequently the deed should receive such a construction as would be consistent with this intention of the parties.

On the other side it is argued, the intention of the parties was, that all the title which the grantor had in the property should be conveyed in trust for the benefit of his wife.  This intention is supposed to be manifested by the language used in the deed, and to be deducible from the fact that the grantor's title to the slaves was acquired through his wife, and therefore, whatever right to them she had at the time of the marriage, he was willing and intended to restore to her.

It is also argued, upon the same side, that the deed of trust vested an absolute title to the slaves in the wife.  That by the *premises* the grantor conveyed all his *right, title, interest,* and *estate* in them, and that, so far as the interest thus conveyed is attempted to be diminished by the *habendum,* the latter is repugnant to the former, in which case the rule applies that " when an *habendum* is contrary or repugnant to the *premises,* the former is void and the *premises* shall stand.  2 *Coke's Rep., part 2nd, page* 478, *Baldwin's case.*

The arguments on both sides are plausible, and the deed itself, even when the whole of its provisions, and the extrinsic circumstances incident to its execution, which tend to elucidate the intention of the parties, are all considered, is still somewhat difficult in its construction.  Looking alone to those parts of it, which are commonly used to define the nature and extent of the estate conveyed, we find that an absolute title was vested in the trustee for the use of the wife, which use, during her life, was to be applied to a particular purpose.  There is no absolute repugnance between the *premises* and the *habendum*—at least the latter is susceptible of such a construction as to avoid a repugnance between them.  He first conveyed the estate to the trustee for the use of the wife in general terms, the latter merely designated the manner in which the use was to be applied during the life of the *cestui que use.*

But it is contended that this is substantially an ordinary deed of trust, conveying the legal title in the whole estate to the trustee, and vesting in the wife a

use in the property during her life and no longer. Conceding, for the sake of argument, that such is the legal effect of the deed, the question would then arise what becomes of the use after the death of the *cestui que use*. In an ordinary case, the purposes of the trust being accomplished, and no further use declared in the deed, it would no doubt result to the grantor. 2 *Story's Equity, section* 1200; 2 *Atk.*, 499. It is the intent that generally regulates and governs the use, and the grantor having expressly limited the use to a life estate, the presumption would be that if he had intended to part with the residue of the estate, he would have declared that intention also. As however the use in such a case results to the grantor, by a mere legal implication, that he did not intend to part with the whole use, inasmuch as a particular use only had been declared by him, this implication may be repelled by other parts of the deed which manifest a different intention, and even parol evidence is admissible for this purpose. 5 *Fonbl. Eq. B.* 2, *chapter* 5, *section* 3.

In this case, construing the deed in the manner contended for, the grantor conveyed an absolute estate in the slaves to the trustee; he declared a particular use, and then expressly gave up all his *right, title,* and *interest* in the slaves *forever,* and bound himself and his heirs never to claim *them,* or any of them, or their profits, at any time *whatever.* Does not this language repel all implication of any *intention* on the part of the grantor that the use should result to himself after the death of his wife? Is it not inconsistent with the idea that the use was to be limited to a life esiate? The covenant that he would never claim *them* at any time whatever, is wholly incompatible with the existence of an intention on his part that the use should result to himself. So far then as this resulting use is a creature of intention, growing out of a legal presumption, it follows as an inevitable consequence, that where no such presumption can arise no such use can result. It is no answer to this argument to say that these expressions refer merely to the estate con-

1. B. conveyed certain slaves and other property to a trustee, absolutely declaring a particular use, and then expressly gave up all his *right, title,* and *interest,* and bound himself and his heirs *never* to claim the property, or any of it, or the profits, at any time *whatever:* Held, that no implication can arise of any intention on the part of the grantor, that any use should result to himself after the particular use had been accomplished, and none did result.

veyed, and mean only that the grantor will not claim in opposition to that estate. It is evident they refer, not to the estate conveyed, but to the slaves themselves. The covenant is not that the grantor and his heirs shall *never* claim the estate or interest vested by the deed in the wife, but that he and his heirs shall never claim the *slaves* at *any time whatever*.

Extrinsic circumstances are however relied upon, not only as explanatory of the language of the deed, but as having an important bearing on the question of intention. One of these circumstances is the belief of the parties that the grantor himself had only a life estate in the slaves, which terminated upon the death of his wife.

2. The fact that a grantor of property in trust for the use of his wife, for life, believed that he had only an estate therein for the life of the wife in the property, when he had an estate in fee, did not conduce to show that he intended that a trust should result to him or his heirs after the death of the wife.

The husband, when he executed the deed, may have believed that the use for the life of the wife was co-extensive with his whole interest in the property, and therefore did not intend, when he gave up all his right and title to the slaves *forever*, and bound himself *never* to claim them, to give up or transfer any right or title of which he was ignorant. But if he acted under the belief that he had only a life estate to convey, the failure to declare a use beyond that interest could not create a presumption that he intended to reserve to himself the residue of the use; for if he believed the use he had declared divested him of all his interest in the property, he would not have intended that any part of the use should result to himself. So far then, as this circumstance has any bearing upon the question of intention, it cannot operate in favor of the grantor or his heirs. If he did not intend to part with anything but a life estate, in the use, because he believed that to be the only interest he had in the slaves, neither could he have intended to reserve any part of that estate to himself, because he had declared a use, which required the whole of the estate for its accomplishment. A resulting use can seldom arise otherwise than by a presumption of intention, and as there can be no such presumption where a grantor does not know that any part of the use remains undisposed of,

but supposes that he has parted with it, the necessary consequence is, that no intention could have existed that a use should result in his favor in this case, if the grantor believed when he executed the deed that he had only a life estate in the slaves, and if the use could result to him under such circumstances, it would be by the mere operation of law, and not by the intention of the parties.

As it is evident, however, from the nature of the transaction, that Arnold, the trustee, was not to have a beneficial interest in the property, but was to hold it merely as trustee, it may be said that although the grantor conveyed the whole of the estate, yet as it was on a particular trust, and that trust has been accomplished, and still the whole estate has not been exhausted, that there arises from necessity, a resulting trust for the benefit of the grantor and his heirs, whether he intended it or not.   This however is an abandonment of the question of intention, and makes the rights of the parties depend upon the legal effect of the deed.   Could however such an interest be claimed successfully, even against the trustee, in direct opposition to the covenant in the deed?   The whole estate passed out of the grantor by the deed; the legal title to it vested in the trustee; the grantor gave up all interest in the *slaves forever*, and bound himself and his heirs never to claim them at any *time whatever*.   This was a valid covenant, entered into with the trustee; it is violated by the claim now asserted, and unless it is to be disregarded presents an insuperable bar to a recovery by the plaintiffs.   The only argument that can be urged why it should not be permitted to have its full effect must be, that it was not made for the benefit of the trustee, but for the benefit of the *cestui que use*, and as it can no longer operate in favor of the trust declared in the deed, its operation must cease and determine altogether.   Let us therefore consider this argument, and ascertain what deductions are necessarily drawn from it.

BENNING
*vs.*
BENNING's Ex'R.

We have thus far construed the deed and consider-- ed its legal effect, upon the assumption that it limited the use which it declared, to a life estate only; but the argument just adverted to, that the covenant it contains on the part of the grantor never to claim the slaves, was made for the benefit of the wife, creates a presumption that the use declared in her favor must have been of the whole estate, otherwise this covenant was not only inapplicable but nugatory, and makes it necessary that we should consider this question, and ascertain and determine the extent of the interest in the property, which actually vested in the wife under the deed.

3. A deed of trust by the granting clause conveyed all the *right, title,* and *interest* of the grantor in certain slaves, to a trustee for the use and benefit of the *cestui que use;* by the *habendum* it is said to be held in trust for the use and benefit of the *cestui que use,* so long as she lives, and to appropriate the proceeds to her support during that period. Held, that the terms of the *habendum* did not have the effect to limit the use to the life of the *cestui que use,* which, by the granting clause, was unlimited, but was only a distinct appropriation of the proceeds during the life of *cestui que use* to a particular

By the premises, in which the granting clause in this deed is contained, the grantor sold and delivered to the trustee, for the use and benefit of the *cestui que use,* all his right, title, interest, and estate in the property conveyed. If this had been the only declaration of the use set forth in the deed, it is evident that the use would have been equal, in point of duration, to the estate vested in the trustee, and that the wife would have had an estate in fee in it. But by the *habendum* it was declared, that the trustee was to hold the property in trust, for the use and benefit of the wife so long as she lived, and to appropriate the proceeds to her support during that period. Did this limit the trust to a life estate, and thereby diminish the duration of the use previously granted? It is obvious that it did not necessarily have this effect. The declaration contained in the *habendum* is not that the use shall continue only during the life of the wife, and then cease and determine altogether, but that it shall be appropriated during that time for the accomplishment of a certain specified purpose. This appropriation of the use, until the expiration of a fixed period, is not at all inconsistent with its subsequent existence in the form in which it was at first created, by the granting clause in the deed. It does not import a limitation of the use previously declared, and as it evidently contemplated an entirely different object, it

should be so construed as to make it consistent with the previous part of the deed. The grantor desired to secure himself from all liability for the support of his wife, and to effect that object he made it the duty of the trustee to apply the proceeds of the trust property to that purpose during her life, but made no disposition of the residue of the use, which had been previously granted.

The word "heirs," which, at common law, was necessary in a conveyance of real estate to pass an estate in fee, never was necessary to transfer the absolute right to slaves or any personal chattel. The whole estate in such property passes without the use of any words of inheritance, and by the granting clause in this deed, the legal title to the property in fee, passed to the trustee as fully and absolutely as if the conveyance had been to him and his heirs forever; and by the same clause the *use* in the whole estate vested in the wife, without any restriction or limitation. The whole estate in the slaves having thus vested under the granting clause in the deed, in both the trustee and *cestui que use*, and it appearing by other clauses in the same instrument, that the whole estate thus granted was to continue *forever*, and the property conveyed was *never* to be claimed by the grantor or his heirs, if the *habendum* were to receive the construction contended for on the part of the plaintiffs, it would be repugnant to this plain *intent*, and be therefore void, in analogy to the ancient rule of interpretation with respect to repugnant clauses in conveyances of real estate. "If a grant be in the premises to "him and his heirs, *habendum* to him for life," the *habendum* would be utterly void, for an estate of inheritance is invested in him before the *habendum* comes, and shall not be divested by it. (2 *Black. Com.*, 298.)

But according to our construction of the *habendum*, there is no inconsistency between it and the premises —they can both stand together, and all the parts of the deed are made to harmonize. If by the premises the estate had passed to the trustee only, without any

BENNING
*vs.*
BENNING'S EX'R.

purpose, and for a particular period. 2 *Black.* 298.

4. The term heirs which at common law was necessary to pass an estate in fee in lands, has never been held necessary in a deed to pass the absolute title to slaves or any personal estate, nor is the term necessary in a conveyance of slaves in trust, to pass the entire right of the grantor to the *cestui que use.*

declaration of a use, then, as the use declared in the *habendum* would have been the only one contained in the deed, there would have been an estate in fee vested in the trustee, and a use for life only in the *cestui que use*. Such, however, is not the case, but on the contrary the whole estate in the use, as well as the whole of the legal estate, is granted in the premises, and the *habendum* does not, nor was it intended, to reduce the use to a mere life estate. This construction is strongly fortified by the covenant, on the part of the grantor, already referred to, and by the language used in every part of the deed, evincing clearly an intention on his part to convey and surrender, all his right and title in the property for the use and benefit of his wife.

The object of the parties in executing the deed was to consummate the compromise which had been made of the suit in chancery, in which the wife sought a divorce, and asserted a claim for alimony. The slaves were given up as alimony, and in satisfaction of all claim which the wife had on the husband for a separate maintenance. This circumstance is relied upon as indicating conclusively that the intention of the parties was to give to the wife a life estate only in the slaves, and it is contended that such an intention is manifestly evident, from the whole scope and design of the transaction.

In support of this argument, great stress is laid upon the word alimony, which is used several times in the deed. It is said that the use of this word denotes the intention of the parties to have been; to provide a support for the wife during her life, and nothing more. But the word alimony signifies, not a support for the wife during her life, but during the life of the husband only. At his death her right to alimony ceases, and she becomes entitled to a portion of his estate, as one of his distributees, part of which belongs to her absolutely. It is obvious, therefore, that the word alimony was not used in this deed according to its correct legal signification, for the pro-

vision made for the wife was not limited to the life of the husband. Besides, the wife was *never* to claim any more of her husband's estate than was given up by him in the deed. That part of his estate was received by her, not only as a support during his life, but also in full satisfaction of her right to a portion of his estate after his death; so that in reality the inference that it was the intention of the parties that the wife should have a life estate only in the slaves, is a deduction unauthorized even by an abstract consideration of the object and design of the transaction, without any reference to the language of the deed.

While, however, we are trying to ascertain the intention of the parties, not only from the language of the deed, and the provisions it contains, but also by a reference to extrinsic circumstances, there is one fact entitled to great weight in this investigation, which has not yet been considered. These slaves came by the wife, and whatever right or title the husband had to them he acquired through her. What more natural, just, and proper then, where a separation had occurred, than that these slaves should be restored to the wife, and that whatever title the husband had to them, whether a life estate or an estate in fee, should re-invest in her, especially as she received them in full satisfaction of all claims against his estate, as well during his life as after his death. And if language had been sought after peculiarly expressive of such an intention, would any have been found more appropriate than that used in the deed, by which the husband "gave up all his right, title, and *interest* in the *slaves forever*, and bound himself and his heirs *never* to claim them, or any of them, at any *time whatever.*" It is perfectly evident that he intended to give up all the right which he had to them, and the apparent difficulty in reconciling the different clauses in the deed, may have been produced by the belief of the writer of it that the husband's interest in them was only a life estate. But be this as it may, we think it is sufficiently manifest that the husband intended to convey all his

right and title to them, for the use and benefit of his wife, and that his intention was not influenced by the belief that his interest in them was only a life estate. But as he acquired them by his marriage with her, he was willing, inasmuch as a separation had taken place, to restore them to her, and re-invest her, in the only way the law permitted it to be done, with whatever title he had to them, whether that consisted of a life estate merely, or an estate in fee. The provisions of the deed are, as we have shown, sufficient for the accomplishment of this object; and the construction we have put upon the instrument—is not only consonant with the intention of the parties, as developed by its language, and the extrinsic circumstances of the transaction, but also with the manifest and intrinsic justice of the case. Besides, it is the only construction by which full effect can be given to all the provisions of the instrument, and by which they can all be made to harmonize together.

Wherefore, the judgment is affirmed.